STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Environmental Division | ENVIRONMENTAL DIVISION<br>Docket No. 111-8-14 Vtec<br>Docket No. 112-8-14 Vtec<br>Docket No. 13-2-15 Vtec<br>Docket No. 100-8-15 Vtec |
| Margaret Pratt Assisted Living Site Plan,<br>Conditional Use and Act 250 Approvals | DECISION ON THE MERITS |

Applicant Enhanced Living, Inc. proposes to build a 48-bed assisted living facility on a 3.5-acre site in the Plateau Acres subdivision in Bradford, Vermont ("the Project"). Applicant has received conditional use approval, site plan approval, and an amended site plan approval from the Town of Bradford ("Town"), and Act 250 approval from the District #3 Environmental Commission ("District Commission"). A group of residents of the Plateau Acres subdivision ("Neighbors") have appealed[1] all four approvals to this Court. The conditional use approval is the subject of Docket No. 112-8-14 Vtec. The appeal of the original site plan approval is Docket No. 111-8-14 Vtec, and the amended site plan approval appeal is Docket No. 13-2-15 Vtec. The Act 250 appeal is Docket No. 100-8-15 Vtec.

Applicant originally obtained conditional use approval and site plan approval in the summer of 2014. Applicant then revised its site plans in December 2014 and sought a revised site plan approval from the Town of Bradford Planning Commission ("Planning Commission") for the amended site plans. Applicant moved to stay the conditional use appeal pending this second site plan approval, and the Court granted its motion. Applicant then received approval for its revised site plan on January 2015, and Neighbors appealed the revised approval to this Court.

---

[1] Neighbors Christine Brown, Stephen Johnson, Elizabeth Reader, Henry Sienkewicz, Robert Sweet, and Sylvia Sweet are all Appellants in this matter. Other neighbors—Jean Young, Dwight Young, and Pamela Wilcox—are Interested Parties.

Applicant submitted an Act 250 application in February 2015, and the District Commission issued Act 250 approval for the Project in August 2015. Neighbors appealed that decision to this Court as well.

Once the Neighbors had filed their appeal of the Act 250 permit determination, and at the parties' request, the Court lifted the stay on the conditional use appeal. The Court then coordinated all four matters—the conditional use appeal, the original site plan appeal, the revised site plan appeal, and the Act 250 appeal—and conducted a single site visit and merits trial for the four appeals. The site visit took place on September 23, 2015, followed by a two-day merits hearing in the Orange County Courthouse in Chelsea, Vermont. Neighbors were self-represented; one Appellant, Christine Brown, served as primary spokesperson for all Neighbors. Applicant was represented by attorney Andrea Gallitano.

Applicant's evidence at trial represents the most current version of its plans for the Project—the same plans it submitted in its revised site plan application to the Planning Commission. Based on the evidence admitted at trial, which was put into context by the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

1.      Applicant proposes to build an assisted living facility on Plateau Acres Road in Bradford, Vermont. The facility will have 32 rooms and 48 beds.

2.      Although Enhanced Living, Inc. is designing the Project and applying for the necessary permits, a different entity—Grand Senior Living—will operate the facility once it is constructed.

**I.      The Neighborhood**

3.      Plateau Acres is a residential subdivision with twenty-six single-family homes.

4.      Plateau Acres is in the Town's Residential District.

5.      As the name suggests, Plateau Acres sits on top of a plateau. The plateau lies to the east of I-91 and the west of U.S. Route 5. Vermont Route 25 lies to the south.

6.      Views from the plateau include views of the Connecticut River Valley to the south and east and I-91 to the west. A distant rock quarry is visible from the plateau.

7.      There are currently no business developments in the subdivision. Though the subdivision is only a thousand feet, as the crow flies, from some commercial development near

Route 5, the commercial development lies below the plateau and cannot be seen from the houses in the subdivision.

8.      The only access road to the subdivision (and to the proposed facility) is Plateau Acres Road.  Plateau Acres Road spurs off of Old Creamery Road near Old Creamery Road's junction with Route 25.

9.      All homes in the subdivision are single-story capes or ranches.  In the loop of houses closest to the Project, there are nine homes.  These houses contain an average of 1,178 square feet in interior space.

10.     The building site for the Project was donated to Applicants by the Pratt family.  Applicant did explore other potential build sites before the Pratt family donated the Plateau Acre site for the Project.

**II.     Project Site**

11.     The facility will be built as a two-story building 287 feet long and up to 35 feet high, with a total of 34,800 square feet of interior space.

12.     The average size for an assisted living facility in Vermont is 64 beds.  This 48-bed facility is as small as is economically feasible for such a facility.

13.     The lot for the proposed Project is 3.5± acres.  The lot is roughly kidney shaped, curving from the east to the south.  The proposed facility will cover less than a third of the lot.

14.     The lot lies on the eastern side of Plateau Acres Road and south of all the houses in the subdivision. Two residential parcels border the lot to the north.  The residential parcels are owned by Dwight Young and Pamela Wilcox, who are both interested parties in this appeal.

15.     In the original site plan for the Project (submitted as Exhibit 2) Applicant proposed to site the building in the eastern portion of the lot.   In response to some of the Neighbors' concerns, Applicant agreed to move the building to the southern corner of the lot (depicted in Exhibit 3).  To make the building fit in the new location, the building had to be reflected or "flipped" along a north-south access.

16.     The new building site is farther from the Young and the Wilcox residences to the north, and the new site plan has the shorter edge of the building facing the residential parcels, which preserves some of the off-site views from those parcels.  The re-sited position makes the

Project significantly more visible from Plateau Acres Road. This re-siting added roughly 1 to 2% to the overall cost of the Project.

### III.  Project Aesthetics

17.  The general shape of the building is a long rectangle, with the long axis running northeast/southwest.  There is a perpendicular wing running from the center of the building to the northwest.  The main entrance is in the northern corner made by the main building and the northwest wing.  There is also a separate entrance to the memory care unit in the southern corner of the main building and the northwest wing. Applicant's site plan can be found at Applicant's Exhibit 3.

18.  The Project will be clearly visible from the southern portion of Plateau Acres subdivision, where nine of the Neighbors' homes are located.  From the northern portion of the Plateau Acres subdivision, the Project will be below the horizon and largely not visible from these homes.

19.  Headed south on Plateau Acres Road, both the northeastern portion of the main building and the northwest wing will be visible, as will the main entrance between the two.

20.  The Project is designed to mimic the appearance of single-family homes in the area by dividing the main portion of the building into different segments.  Each segment will be a different color and have a different roofline height. Each segment's roof will be pitched.

21.  The northwest wing does not have a varied roofline.  The primary view from Plateau Acres Road, which encompasses the northwest wing, will not benefit much from the varied roofline design. Likewise, the view of the Project from Mr. Young's house will be of one continuous roofline.

22.  In the original design, the northwest wing spurred off of the building to the northeast. Because traffic on Plateau Acres Road approaches the building from the northeast (and neighboring properties view the building from the northeast), only the gable end of the northwest wing would have been visible in the original design.  Applicant re-sited the building (with the consequence of increasing the prominence of the unbroken roofline on the northwest wing) at Neighbors' request.

23. Mr. Young and his wife have coffee from their back deck every morning and campfires in the evening. Their present view from their back deck is of the open lot and the surrounding hillsides, including the terraced rock quarry.

24. In its re-sited position, the Project will reduce the views from Mr. Young's property. Applicant submitted a simulated view from Mr. Young's back porch depicting the re-sited Project (Exhibit 8). As depicted, the Project will occupy most of the southwestern view Mr. Young's from his porch and kitchen window. The re-sited building will preserve Mr. Young's southeastern view.

25. Applicant offered to plant landscaping on the boundary with the Young property, but Mr. Young said he would prefer no trees at the boundary, since they would further obscure the view from this deck.

**IV.    Lighting**

26. The proposed lighting plan includes twelve fourteen-foot-tall pole lights with LED array fixtures for the Project parking areas. These pole lights are lower than would ordinarily be used for a commercial parking area; the lower height of these proposed pole lights will help mitigate possible off-site light pollution.

27. There will be four LED light fixtures mounted to the exterior walls of the building, three at 9 feet and one at 12 feet above the ground. There will also be recessed canned lights at the main entrance and the memory care entrance.

28. Applicants have chosen to use LED lights because they create less glare than conventional bulbs.

29. All lights will be shielded to conceal the LED light source and to cast light downwards. The lights closest to Mr. Young's house will also be downcast and will have side shields to help reduce light pollution on Mr. Young's property.

30. In response to Neighbors' objections to the lighting plan, Applicant agreed to dim the fourteen pole-mounted lights and the 12-foot wall-mounted light to 33% brightness from dusk to 11:15 p.m. There will be motion sensors on the lights, and they will go to 100% brightness if the motion sensor is activated. After 11:15 p.m., the lights will be turned off, but will activate

to 100% in response to detected motion.  The three 9-foot wall-mounted lights will be off from dusk to dawn, except when activated by the motion detectors.

31.     The recessed canned lights at the main and memory care entrances will be on at 100% from dusk to dawn for safety purposes.  The memory care entrance is in the corner made by the southwestern portion of the main building and the northwest wing of the building, so light from this entrance will likely not be visible from any of the residences in the Plateau Acres subdivision (which lie to the northeast of the building).

32.     Overall, light levels will be lower than customary for this type of facility.

33.     There are currently no streetlights in the residential subdivision.

**V.      Traffic**

34.     The only access point to the facility will be off Plateau Acres Road, which is also the sole access road for the Plateau Acres subdivision.

35.     Plateau Acres Road branches off Old Creamery Road near Old Creamery Road's intersection with Route 25.  There is a state-run park and ride off of Plateau Acres Road near its intersection with Old Creamery Road.

36.     At its intersection with Old Creamery Road, Plateau Acres Road runs northwest/southeast.  The road curves to the northeast as it climbs steeply up from Old Creamery Road.  There is a curb on the inside of the curve and a guardrail on the outside.

37.     Plateau Acres Road, at the curve below (south of) the residential subdivision, is narrow enough that two large vehicles, opposing each other, must slow down to pass safely.

38.     The Vermont Agency of Transportation ("VTrans") publishes complete listings of all reported crashes that exceed a threshold of $3,000 in damage.  VTrans reported no crashes on Plateau Acres Road from 2008 to 2014.

39.     At the curve on Plateau Acres Road, one of the Neighbors reported that a relative collided with the curb, causing damage to her vehicle, in order to avoid oncoming traffic.  The driver did not report the accident.

40.     The District Commission imposed a condition in Applicant's Act 250 permit, which Applicant did not appeal, requiring Applicant to install a pedestrian path along the eastern (interior) side of Plateau Acres Road, running from the Project's driveway to the park and ride

at the bottom of Plateau Acres Road. The District Commission directed the Applicant to seek the approval from the Town for the terms and location of the sidewalk.

41. The pedestrian path will be finished with hard-packed earth. Applicant will maintain the path on a seasonal basis (i.e., the path will not be cleared during the colder winter months). Applicant will build the path first, so that it will be available during construction.

42. The proposed building will be constructed off-site and then delivered to the site in modular pieces, generating up to 40 one-way truck trips on Plateau Acres Road. During these trips, cars will not be able to pass the oversized loads, and will need to wait to exit the development. Applicant will employ flaggers directing traffic at both ends of Plateau Acres Road during these truck trips.

43. Other than these 40 or so trips, both lanes of Plateau Acres Road will be open to all drivers during and after construction. Applicant will make "every effort" to ensure that oversized loads and large deliveries during construction only take place between the hours of 8:00 a.m. and 4:00 p.m.

44. There is an old access road to the subdivision off of Old Creamery Road, north of Old Creamery Road's intersection with Plateau Acres Road.[2] This access road has been closed for many years and is in poor condition. It is privately owned. The road is currently gated, but the Town road foreman does have a key to the gate. In an emergency, the Town could open the road to allow an emergency vehicle through.[3]

45. Most of the traffic the Project will generate will come from staff going to and from the facility. Most of the trips added by staff will take place at shift changes at 7:00 a.m., 3:00 p.m., and 11:00 p.m. The typical morning peak hours for traffic are 7:00 to 9:00 a.m. and the typical

---

[2] This old access road was the original access road to the subdivision, and it was also called "Plateau Acre Road." The road was closed for safety reasons, and the current "Plateau Acres Road" was built farther south, to replace the deficient road.

[3] The Town ZBA imposed a condition in Applicant's conditional use approval that Applicant re-open this access road to provide alternate access to residents during construction, though other Town representatives think that condition inadvisable. Applicant did not appeal that condition, but Appellants raise concerns regarding the safety of the old access road in their Statement of Questions in the conditional use appeal. We have therefore concluded that the condition of re-opening this old roadway, particularly during construction, is within the scope of our review.

evening peak traffic hours are 4:00 to 6:00 p.m. The morning shift change may overlap slightly with typical morning peak hours, but the two evening shift changes will not.

46. The day shift (7:00 a.m. to 3:00 p.m.) will have roughly fifteen to twenty employees.

47. The evening shift (3:00 p.m. to 11:00 p.m.) will have roughly eight employees.

48. The night shift (11:00 p.m. to 7:00 a.m.) will have roughly five to seven employees.

49. Applicant will establish a carpooling incentive program to encourage employees to either carpool the whole way to work or park at the state park and ride at the base of Old Creamery Road and carpool up to the facility.

50. Residents are allowed to have visitors, but, regrettably, assisted living facilities do not get many visitors. The facility will likely generate about eight to ten visitors per day, and most of the visitors will come during the day or in the evening.

51. Emergency vehicles may come to the facility but will typically shut off sirens before approaching the facilities. Applicant estimates that there will be two emergency vehicle visits per week.

52. There will be deliveries to the facility, including pharmacy and food deliveries. Applicant has the power to control delivery times. All told, Applicant expects there to be roughly five or six food and pharmacy deliveries per week.

53. Food deliveries would likely be made via "box truck," i.e., a truck that is a little bigger than the average UPS truck.

54. Trucks used for once-a-week garbage pickup would be the biggest trucks to visit the facility. Tractor trailers will not deliver to the facility because the internal roads on the site are too small for a tractor trailer to navigate, and Applicant will prohibit the use of tractor trailers by their vendors for deliveries to the facility.

55. Stagecoach, a regional public bus service, may make two daily stops at the facility, spaced several hours apart, to allow residents to ride to nearby towns and return to the facility. Applicant will have the power to control the Stagecoach visit times.

56. Using Applicant's maximum estimates of employee trips, visitor trips, emergency vehicle trips, deliveries, and garbage pickup trips, the facility would generate an average of just under 95 one-way vehicle trips per day.

57.     Applicant engaged Michael Oman, a traffic expert, to estimate traffic generated by the Project and the additional traffic's effect on existing conditions. Mr. Oman also analyzed the layout of the facility and the crash history at the site to determine traffic safety.

58.     Mr. Oman estimated existing traffic and traffic generated by the Project by looking at published trip-generation rates for similar facilities. Trip-generation rates for different types of developments are published by an organization known as ITE.

59.     Mr. Oman estimated existing p.m. peak hour trips at the Plateau Acres subdivision by counting the number of homes (by his count, 26 single-family homes) and projecting p.m. peak hour trips based on that home count. By his estimate, there are currently 31 p.m. peak hour trips and 301 daily one-way vehicle trips on Plateau Acres Road at present.

60.     Based on ITE data, Mr. Oman estimates that the Project will generate 14 trips in the afternoon peak hour (the busiest hours being between 4:00 and 6:00 p.m.). The ITE data suggests that, on average, assisted living facilities generate eleven p.m. peak hour trips, but the facilities that the ITE data are based upon were anywhere from 80 to 180 beds, and ITE did not have data on a facility as small as this proposed project. Because ITE data tend to underestimate traffic for smaller facilities, Mr. Oman found the maximum number of p.m. peak hour trips generated by an assisted living facility (14) to be more reliable. We found Mr. Oman's estimates to be credible.

61.     Fourteen added p.m. peak hour trips represent a 45% increase in p.m. peak hour traffic.

62.     Based on these same ITE data, Mr. Oman estimates that the Project will cause 188 new one-way vehicle trips per day, on average. The Court also found this estimate credible.

63.     188 new one-way vehicle trips represent a 62% increase in the number of vehicle trips over existing conditions.

64.     Mr. Oman credibly assessed this volume of estimated new traffic to be "minute" compared with other projects he has analyzed. But he also testified that existing vehicle trip averages on Plateau Acres Road to be minimal as well. The Court found Mr. Oman's assessment credible that, given the existing low volume of traffic on Plateau Acres Road and the small amount of new traffic that the proposed Project will generate, the Project will not adversely impact the existing traffic or nearby residents using Plateau Acres Road.

65. Mr. Oman also analyzed the safety of the proposed intersection of the Project's driveway and Plateau Acres Road. Mr. Oman concluded that geometry of the proposed intersection is safe. While Neighbors expressed several sincere concerns regarding the Project's traffic impact (especially at the curve in Plateau Acres Road), they did not refute Mr. Oman's assertions regarding the safety of the Project driveway's intersection with Plateau Acres Road. The Court therefore finds Mr. Oman's traffic conclusion credible.

66. Mr. Oman's analysis did not examine the safety of the sharp curve on Plateau Acres Road.

67. Mr. Oman acknowledged that adding an assisted living facility would increase the proportion of truck traffic on Plateau Acres Road.

**VI.    Noise**

68. Applicant expects the facility to be very quiet after 7:00 in the evening.

69. Most of the noise associated with the Project will be from vehicle traffic, though the facility will also have a generator (health care facilities are required to have a generator in case of power outages).

70. The generator will be a "number 2 sound attenuated" generator, which is the most sound-proof generator commercially available. The generator would only be used in the event of a power outage, but it would need to be tested under full load once a month for at least an hour. Applicant has the power to control when it tests its generator, and would test the generator during the day.

71. The facility is also required to do three fire safety drills per fiscal quarter. The alarm is internal to the building, and the sound would not be readily discernable outside of the facility.

72. There would also be construction noise during the construction phase of the facility. Since the building modules will be constructed off site, the construction period will be relatively short.

**Conclusions of Law**

Appellants have chosen to represent themselves in this proceeding and have therefore taken on the responsibility of presenting their concerns and objections directly to the Court. While we are directed to hold self-represented litigants to the same legal standards as a party

who may be represented by an attorney, we are also directed to make sure that the fact that self-represented litigants do not have an attorney's assistance and may not be familiar with Court procedures and strategies does not cause unfair disadvantage for the self-represented litigants.  In re Verizon Wireless Barton Permit, 2010 VT 62, ¶ 22, 188 Vt. 262 ("When a party appears pro se, the trial court should be cautious that the pro se litigant is not 'taken advantage of by strict application of the rules of procedure.'" (quoting Town of Washington v. Emmons, 2007 VT 22, ¶ 7, 181 Vt. 586)).

We have kept this obligation in mind in reviewing Neighbors' Statement of Questions in each of the four appeals that they have presented to the Court.  While each of those pleadings extend over several pages and pose some questions that are outside our jurisdiction in these de novo appeal, we believe that their challenges may be summarized in each appeal.  We therefore review these summarized legal issues within the context of each of the appealed applications.

## I.    Conditional Use Review

Nursing care facilities and assisted living residences are a conditional use in the Town's Residential Zoning District.  See Town of Bradford Zoning Bylaws (adopted Oct. 27, 2005) ("Bylaws") § 3-8.[4]  As such, they are subject to general standards for conditional uses, see id. § 6-4, as well as specific standards for nursing care facilities and assisted living residences.  See id. § 5-26.  Because the Project is a commercial use, the facility is also subject to the exterior lighting requirements in Section 5-18.[5]

Neighbors argue that the Project does not satisfy the general or specific conditional use standards because the size of the building is inconsistent with the character of the area, the Project's exterior lighting will result in glare, traffic from the Project will unduly burden Plateau

---

[4] Admitted at trial as Exhibit 26.

[5] The lighting requirements in Section 5-18 apply to all industrial and commercial projects.  See Bylaws § 5-18.  At trial, Applicant's representative characterized the Project as "residential."  At another point in the trial, Applicant's attorney indicated that he would, at some point, argue that "certain provisions" of the Bylaws did not apply because the Project was residential.  Applicant's attorney never completed that argument or pointed to any provisions that should not apply to the Project.  Even assuming that Applicant challenged the applicability of Section 5-18, we conclude that an assisted living facility should be considered a "commercial" use.  We therefore conclude that Section 5-18 applies to this Project.

Acres Road and pose safety problems, and noise from the Project and associated traffic will adversely affect the neighborhood.

Before we reach the merits of the conditional use review, however, we must first address a jurisdictional issue that Applicant touched on at trial, but which was never fully addressed at trial or in pre-trial filings: whether revisions made to the application in December of 2014 require remand to the Town of Bradford Zoning Board of Adjustment ("ZBA") for conditional use review of the revised Project.

    a.     *Necessity of Remand*

Applicant received conditional use approval for the Project from the ZBA in 2014, when Applicant submitted its first round of plans. In an attempt to lessen the Project's impact on neighbors' scenic views, Applicant revised its site plans and relocated the building from the eastern portion of the lot to the southern portion of the lot, which also brought the building closer to the road. In order to make the Project fit in its new location, the revised site plans also reflected or "flipped" the Project along a north-south axis, so that the revised Project is essentially the mirror image of the original Project. Applicant also added significant detail to the lighting and landscaping plans.

Applicant sought site plan approval for the revised site plans from the Planning Commission, which the Planning Commission granted (and which Neighbors appealed in Docket No. 13-2-15 Vtec). Applicant also asked the Town of Bradford Zoning Administrator whether it needed a conditional use approval for the revised plans. The Zoning Administrator informed Applicant that "since the proposed use of the property for an assisted living facility has not changed from the originally approved application, there is no need to submit a revised application to the ZBA." See Exhibit 19. Relying on this, Applicant never submitted a revised conditional use application. Thus, the ZBA—a distinct body from the Bradford Planning Commission, and the municipal panel required to hear conditional use applications, see 24 V.S.A. § 4460(e); Bylaws § 6-4—never reviewed the revised plans under the conditional use standards.

The Environmental Division is a court of limited appellate jurisdiction; we may only review applications that have been fully reviewed by the appropriate tribunals below. See In re

Torres, 154 Vt. 233, 236 (1990). From this, it follows that if permit revisions adopted during the pendency of an appeal "change the nature of the permit requested, alter the location of the project, or increase the scope of the project," the application must be remanded, because the appropriate tribunal below has not reviewed the same "project" that is before the Court. See In re Chaves A250 Permit Reconsider, 2014 VT 5, ¶ 13, 195 Vt. 467; In re Sisters & Bros. Inv. Grp., LLP, 2009 VT 58, ¶ 21, 186 Vt. 103. Though neither party has invoked this "remand doctrine," remand issues are jurisdictional, and are therefore not waivable. Cf. In re Torres, 154 Vt. 233, 236 (1990). Because the issue affects our authority to decide the matter, we must examine whether changes Applicant made to its site plan between the first and second site plan approvals are substantial enough to require remand to the ZBA for a renewed conditional use review.

Under the remand doctrine, only "truly substantial" changes to a project require remand. Sisters & Bros., 2009 VT 58, ¶ 21. While drawing the line between "substantial" and "insubstantial" changes can be tricky, there are some guiding principles. First, where changes to an application do not present new issues for consideration, but merely "supplement[] information that was already available," remand is not necessary. In re All Metals Recycling, Inc., 2014 VT 101, ¶ 20; see also In re Creative Spirit CU, Docket No. 99-7-13 Vtec, slip op. at 13 (Vt. Super. Ct. Envtl. Div. Nov. 17, 2015) (Durkin, J.) (holding that revised plans did not require remand where they merely added detail to a proposal). Second, oftentimes developers will revise a project in an attempt to address specific objections from opposing parties. Because we hope to encourage compromise, it would be "poor policy" to punish developers' mitigation efforts by imposing additional process. In re Chaves A250 Permit Reconsider, 2014 VT 5, ¶ 16, 195 Vt. 467 (citing Sisters & Bros., 2009 VT 58, ¶ 21,). We are therefore less inclined to remand when the revisions at issue were made in response to specific objections from a project's opponents. See id. Finally, where changes to an application have the potential for significant adverse impacts under the applicable standards, or where the changes may shift the impacts of development to parties not before the Court, the Court should consider remanding the application to allow for full participation by the newly affected parties. See In re Lathrop Ltd. P'ship, 2015 VT 49, ¶ 103. In light of these considerations, we do not consider Applicant's

revisions to warrant remand for an additional conditional use review by the ZBA. First, the lighting and landscaping plans submitted in the revised site plan proceedings do not appear to be changes to the original application, but merely more detailed depictions of the same general plans. Second, it appears that all changes to the site plan were made in an effort to move the building farther away from objecting neighbors' property lines. These kind of responsive changes are particularly unlikely to require remand. See In re Chaves, 2014 VT 5, ¶ 16. Third, while the relocation of the building may have impacts under the conditional use criteria, the relocation does not appear to have shifted these impacts from some neighbors to others, and therefore does not appear to prejudice parties not before the court. See In re Lathrop Ltd. P'ship, 2014 VT 49, ¶ 103. Finally, the decision whether to remand an application, though jurisdictional, is also one over which we have some discretion. See id. ¶ 99 ("Our standard of review for the environmental court's decision to remand a permit application is abuse of discretion."). Finally, we also must take into consideration the nature of the permit application submitted. Given that Applicant made changes to the siting of their proposed building, it was incumbent upon Applicants to present this new site plan to the Planning Commission for consideration as an amendment to their original site plan approval. However, given that there had been no changes made to the nature of the project or its use and purpose, there would be little for the ZBA to consider in a second conditional use review.

In this case, we therefore conclude that remand of the conditional use application is not warranted, due the nature of the site plan changes and the motivation for those changes (to alleviate expressed concerns of impacted neighbors).

b.     *Conditional Use Review*

To receive conditional use approval, an applicant must show that its project satisfies "general" standards (applicable to all conditional uses) and "specific" standards (applicable to the type of use for which approval is sought). See 24 V.S.A. § 4414. Section 6-4 of the Bradford Bylaws provides general standards for all conditional uses. Section 5-25 provides specific standards for nursing care facilities and assisted living residences. Commercial and industrial conditional uses are also subject to exterior lighting requirements under Section 5-18.

Neighbors' Statement of Questions in their conditional use appeal contains ten unnumbered questions, which generally challenge four aspects of the Project's conditional use: the size of the building (under Sections 6-4(b) and 5-26(C)); noise from the building (under Section 5-26(A)); traffic and burden on roads (under sections 6-4 and 5-26(B)); and lighting and glare from the Project (under Section 5-18). We address these standards in the order presented.

1.      Size of the Building

Neighbors argue that the size of the building does not satisfy the conditional use general standards because it will "adversely affect . . . the character of the area affected," see Bylaws § 6-4(b), and that it does not satisfy the special standards because it will not "complement the character of buildings, streetscapes, and landscapes of the immediate area" or "respect the traditional scale, proportions, shapes, and rhythms of the immediate neighborhood." See Bylaws § 5-26(C).

It is undisputed that that the proposed building will be larger than the residential buildings that occupy the adjoining lots. But this does not necessarily mean that the Project will adversely affect the Plateau Acres subdivision, or that it will not "complement" or "respect" the neighborhood's existing development.

Turning first to whether the Project's size will "adversely affect . . . the character of the area," we do not consider the size alone to have adverse effects. While it is true that the Project is larger than its surroundings buildings, it does not follow that its effect on the character of the area will be adverse.[6] If the Project had a totally different aesthetic sensibility, or different uses or "rhythms" (which it does not) it might adversely impact the character of the residential neighborhood, but its size alone does not.

As to whether the Project "complements" and "respects" the neighborhood's existing scale and rhythms, a building does not have to be identical to complement or respect existing development. Applicant has designed this smaller-scale assisted living facility to complement

---

[6] We do find that the Project's size makes it "adverse" under our Criterion 8 analysis because that analysis emphasize whether a new development will "fit" (i.e., match) its aesthetic surroundings. Under the conditional use analysis, we ask whether a Project will adversely affect the character of the area, which requires a more functional analysis.

the existing residential structures by minimizing the building's height, by using traditionally residential exterior materials and colors (e.g., clapboard siding and soft colors), and by attempting to break up the visual bulk of the building by varying the rooflines and facades. Further, even though the Project is a commercial undertaking, the Margaret Pratt facility is a residential facility from the perspective of its users, and the "rhythms" of the Project will match the residential rhythms of the subdivision.

Applicant has modified its lighting plan to better suit existing light levels in the subdivision; Applicant has said it will only test its generator during the day; and Applicant has suggested that it could require garbage pickups, vendor deliveries, and Stagecoach (i.e., public transportation) visits to occur during the day. We have incorporated these suggestions as conditions of approval in our lighting, traffic, and noise discussions (see below Parts I.b.2–4).

All of these measures show that the Project will "respect" the residential rhythms of the neighborhood. Thus, the resulting neighborhood, once this proposed development is completed, will change little from its present character as a quiet residential neighborhood. We therefore conclude that the proposed building will not adversely affect the character of the area and will complement the traditional scale, shapes, and rhythms of the immediate neighborhood. We have reached this conclusion, in part, due to the specific nature of the uses proposed for this facility: the completed facility will be operated as a not-for-profit residential facility for older residents and others needing care. Such a facility, from the perspective of its residents, will have a use similar to the uses of the owner' homes in the adjoining residential development: this proposed facility will be their home, which they will most likely occupy without causing extraneous disturbances outside of the facility.

2.    Lighting

Neighbors object to the proposed lighting plan for the Project. The special standards require that all assisted living facilities "be operated in a manner to ensure that the facility would not create excessive . . . light on the site or in areas in close proximity to the site." Bylaws § 5-26(A). Section 5-18 also imposes lighting standards for commercial and industrial projects. It requires that:

(1) Light levels and distribution be appropriate for the use of the site, and compatible with the character of the neighborhood and district.

(2) Be designed to minimize glare and not directly light beyond the boundaries of the area to be illuminated or onto adjacent properties or result in excessive lighting levels.

(3) Be shielded to direct light downward and not into the night sky and to reduce traffic hazards.

Bylaws § 5-18.

The Project complies with both sections.  Applicant has taken precautions to minimize light from the facility, and has ensured that all lights are shielded to direct light downwards (satisfying Section 5-26(A)(3)).  The lighting is not "excessive" (satisfying Sections 5-26(A) and 5-18(2)) because it is not more than necessary for this type of facility—Applicant's lighting designer testified that the lighting plan uses less light and at lower heights than assisted living facilities of this size would ordinarily use, in an effort to address Neighbors' concerns.

As to whether the lighting is "compatible with the character of the neighborhood or district," we note that after 11:15 p.m., all lights (except the recessed canned lights over the memory care and main entrances) will be off unless activated by motion detectors.  Because the night shift will run from roughly 11:00 p.m. to 7:00 a.m., it is unlikely that there will be motion in the parking lot activating the lights after 11:15 p.m.  After 11:15 p.m., therefore, the only light visible to the Plateau Acres residents will be the recessed canned light over the main entrance (the memory care entrance is on the southeastern side of the building, and that entrance will not visible from the Plateau Acres houses to the north.  This amount of light is not "excessive" or incompatible with the character of the area.

Before 11:15 p.m., the facility will generate more light than the surrounding houses, but Applicant has agreed to dim the lights to 33% brightness (but resuming to 100% brightness in response to detected motion), in an effort to respond to Neighbors' concerns. The Court finds it unlikely that there will be much motion in the parking area (the most visible area to surrounding Neighbors) after the 7:00 p.m. shift change.  We nonetheless acknowledge that the Project, even with dimmed lights, will add some ambient light to the area, and that this may interfere with Neighbors' ability to see the night sky (one of the attributes of their neighborhood they cherish most).  We are also mindful that 11:15 p. m. may be too late in the

evening for residents to benefit from the darker skies, since they may already be asleep at that time.  Finally, we find that, because the lights will be motion-activated, having lights off (as opposed to dimmed) during the 11:00 p. m. shift change does not pose a safety risk, since the lights will activate to 100% when employees enter the parking area.  We will therefore require Applicant to turn the lights from dimmed (with motion activation to 100%) to off (with motion activation to 100%) at 9:00 p.m. instead of 11:15 p.m.  With this lighting condition in mind, we conclude that the facility complies with Sections 5-26 and 5-18.

### 3. Traffic and Burden on Roads

Neighbors object to potential traffic from the Project on the grounds that added traffic from the Project will place an undue demand on Plateau Acres Road, in terms of both safety and congestion.  Neighbors also argue that construction traffic from the Project may block access to Plateau Acres Road and that the condition in the ZBA approval requiring Applicant to re-open the old subdivision access road off Old Creamery Road is not safe.[7]

The general standards for conditional uses provide that conditional uses "may not adversely affect . . . [t]raffic on roads and highways in the vicinity."  Bylaws § 6-4.  The special standards for nursing care facilities and assisted living facilities also require that "the scale and intensity of facilities . . . not place unreasonable demands on roads or streets leading to and from the site."  Bylaws § 5-26(B).  The special standards authorize the ZBA (or the Court) to impose conditions of approval "limiting the number of individuals, children, patients, and staff residing at the facility, or visitations, hours of operation, vehicle trips, and similar constraints for the purpose of protecting the public interest."  Id.

According to Applicant's traffic estimates, the Project will increase overall traffic by 62% and p.m. peak hour traffic by 45%.  The construction of the facility will also add 40 "oversized load" trips to the Project site during a specific limited period.  This increase in traffic will not be adverse or unreasonable because this traffic will not go farther up Plateau Acres Road than the Margaret Pratt facility itself, and therefore will not cause significant noise and disturbance to Neighbors.  With the exception of a once-per-week garbage truck, the largest trucks that will

---

[7] Neighbors' question is phrased in response to the ZBA's requirement that Applicant re-open old Creamery Road during construction.  Applicant did not appeal that condition, but we consider the condition to be within the scope of our review based on Neighbors' Statement of Questions.

deliver to the facility are box trucks of the same size that already come to the subdivision for Neighbors' personal UPS and FedEx deliveries. While the increase in traffic will necessarily increase the chances of cars passing each other on the curve on the lower part of Plateau Acres Road, most of the drivers will have some familiarity with the facility (since they will mostly be staff, vendor delivery drivers, and visitors), and will be able to negotiate the curve without incident, just as Plateau Acres residents have (with one exception) done in the past.

We nevertheless acknowledge that the Project will increase traffic on Plateau Acres Road, and, to help minimize the effect of the Project on Neighbors, the Court conditions its approval on Applicant limiting vendor deliveries, garbage pickups, and Stagecoach visits to the facility to between the hours of 9:00 a.m. and 4:00 p.m., so that those vehicle trips will not coincide with the existing peak traffic hours. The Court also conditions approval on Applicant limiting delivery of oversized loads during construction to between the hours of 9:00 a.m. and 4:00 p.m. Because the Court agrees that the condition requiring Applicant to re-open the former (and now defunct) access road to the subdivision during construction is unsafe, the Court strikes that condition from Applicant's conditional use approval.

4. Noise

Neighbors object to potential noise from the Project, pointing to possible fire alarms and noise from trucks making deliveries to the Project. The special standards for nursing care facilities and assisted living facilities prohibit "excessive noise . . . on the site or in areas in close proximity to the site." Bylaws § 5-26(A). The evidence at trial showed that there will likely be little or no noise emanating from the facility itself. While the operators of the facility are required to do three fire alarm drills per quarter, the sound from the fire alarm will be internal to the building, and will likely be imperceptible to Neighbors. The operators must also test their generator under full load for one hour once a month. Applicant has the power to control when those tests are done, and the Court will condition its approval on Applicant limiting generator tests to between the hours of 9:00 a.m. and 4:00 p.m., to limit the impact of the noise. The added traffic from the facility will generate noise, but this traffic will not go further up Plateau Acres Road than the facility itself, and will not pass in front of any of the subdivision's houses.

The noise from this traffic will therefore not be a significant disturbance. We therefore conclude that the Project will not generate excessive noise.

Because we conclude that the Project, as conditioned, conforms to the conditional use requirements in Sections 6-4 and 5-26, as well as the lighting requirements in Section 5-18, we **APPROVE** Applicant's conditional use application.

II.     **Site Plan Review**

Neighbors appealed both the original site plan approval from the ZBA (Docket No. 111-8-14 Vtec) and the approval of the revised site plans (Docket No. 13-2-15 Vtec). Because this second site plan represents what Applicant currently proposes to build, we will only examine the revised site plans (Docket No. 13-2-15 Vtec). The appeal in Docket No. 111-8-14 is therefore **MOOT.**

Neighbors' Clarified Statement of Questions in the revised site plan appeal raises general concerns over the amount of traffic generated by the Project (Question 2), the scale of the facility (Questions 3–6), the Project's effect on Neighbors' property values (Question 7), and the Project's lighting (Questions 8–9). These Questions appear tailored to the conditional use standards, under the theory (expressed in Question 1) that the Project should fail site plan review because it does not satisfy conditional use standards.

Generally speaking, the purpose of site plan review is to "provide a detailed analysis of the physical characteristics of a development project with the focus on building layout," and "[q]uestions of whether a particular use will be allowed are appropriately dealt with through a special permit process, not through a site plan process." 5 Arden H. Rathkopf et al., Rathkopf's The Law of Zoning and Planning § 87:4 (4th ed. WL updated Nov. 2015). Furthermore, nothing in the site plan review standards in the Bylaws requires that a project comply with other provisions of the Bylaws—other provisions in the Bylaws are relevant to their respective approvals, but they are not relevant to site plan approval. Cf. Bylaws § 6-12(e) ("If a conditional use requires Site Plan Approval, the Planning Commission may coordinate its review process with the Board of Adjustment and arrange concurrent meetings with the applicant *within the limits provided for each review*."). We therefore answer Neighbors' Question 1, which asks whether the Planning Commission should have considered "all sections of its Zoning Bylaws" in

reviewing the site plan, in the negative. We will only consider Neighbors' site plan questions that raise issues relevant to the site plan approval.

Subsection 6-12(a) of the Bylaws subjects all "commercial, industrial, public and quasi-public, or multi-family dwelling[s]" to site plan approval. Subsection 6-12(b) of the Bylaws provides:

> In considering its action, the Planning Commission [or this Court on appeal] shall review the application information . . . , taking into consideration the following objectives:
>
> (1) The maximum safety of vehicular and pedestrian circulation between the site and street network and adjacent traffic generators.
>
> (2) The adequacy and safety of circulation, parking and loading facilities.
>
> (3) Adequacy of landscaping, screening, and setbacks in regard to achieving maximum compatibility and protection of adjacent properties.
>
> (4) The avoidance of glare.
>
> (5) The adequacy of surface drainage facilities.
>
> (6) The protection of the utilization of renewable resources and natural resources.
>
> (7) The provision of municipal services.

Bylaws § 6-12(b). Subsection 6-12(c) of the site plan standards authorizes the Planning Commission to impose conditions on internal traffic design to ensure that traffic safely connects to the road network. Subsection 6-12(d) provides specific landscaping considerations.

Even construing Neighbor's questions liberally, most of Neighbors' questions in the site plan appeal do not raise issues pertinent to these site plan review standards. Questions 2 and 3 ask whether the traffic generated by the Project will create excessive traffic or place unreasonable demands on Plateau Acres Road. While *conditional use* standards address problems associated with increased traffic volumes (see Part I.b.3, above), the traffic standards in site plan review are designed to regulate safety of the "circulation between the site and street network,"—i.e., the design of internal roads and geometry of a Project's connection to existing roads.[8] Neighbors do not appear to challenge the Project's road design, but merely the

---

[8] The only provision in the site plan review section relating to external traffic volume is Section 6-12(c)(6), which provides, "In concentrated or developing areas with high traffic, the Commission shall consider requirements for pedestrian walkways or a set aside of land dedicated for future walks between buildings, parking

-21-

added traffic the Project will generate. Their traffic questions are therefore relevant to conditional use approval, not site plan approval, and have already been addressed above.

Questions 4, 5, and 6 ask whether the building itself is consistent with the character of the surrounding neighborhood and respects the traditional scale of the neighborhood, given its size. The size of the building and its consistency with the character of the neighborhood are relevant to conditional use review, but not relevant to the factors for site plan review.

Question 7 asks whether the Project will diminish Neighbors' property values. This is an understandable concern, but not relevant to site plan review. Questions 2 through 7 in Neighbors' site plan appeal, Docket No. 13-2-15 Vtec, are therefore **DISMISSED.**

Question 8 asks whether the Project's lighting will cause excessive glare. This is directly relevant under the fourth consideration for site plan review ("[T]he avoidance of glare"). Bylaws § 6-12(b)(4). Question 9 asks whether the lighting plan is "compatible with the character of [the] neighborhood," given that the Plateau Acres development does not contain a single streetlight at present. Though there is no character-of-the-area requirement in the site plan standards, we interpret this question to raise the factual argument that the Project's lighting is more likely to cause glare in the present low-light environment, which is also relevant Section 6-12(b)(4) under site plan review.

As discussed in Part I.b.2 of our conditional use review, Applicant has attempted to respond to Neighbors' concerns over glare, and has provided for downcast LED lights in its lighting plan with lower pole heights than customary, and has agreed to dim the lights in the evening and turn them off entirely (except when motion-activated) after 11:15 p.m. We have further conditioned the conditional use approval on Applicant turning off the dimmed lights (with motion activation) after 9:00 p.m. This lighting plan adequately addresses glare issues while still balancing the need for safety at the facility. We therefore **APPROVE** Applicant's site plan application.

---

lots, or along highways." Since Applicant has already proposed to add a pedestrian walkway, this provision is not in dispute.

**III.** **Act 250 Review**

The sole issue raised in Neighbors' Act 250 Statement of Questions is whether the Project conforms with the aesthetic requirements of Criterion 8. Act 250 Criterion 8 requires that projects not have an "undue adverse effect" on the aesthetics of an area. See 10 V.S.A. § 6086(8). We use the two-part "Quechee test" to determine whether a project's impacts satisfy Criterion 8. See In re Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, at 18 (Vt. Envtl. Bd. Nov. 4, 1985).

First, we consider whether a project will have adverse impacts. Id. Whether an impact is "adverse" depends on whether the development will "fit" its aesthetic context. Id. If we find a development will have adverse impacts, we consider whether those impacts are "undue." Id. at 19–20. Adverse impacts are "undue" if: (1) the project violates a clear, written community standard; (2) the project offends the sensibilities of the average person; or (3) the applicant has failed to implement reasonable and generally available mitigating measures. Id.[9] Neighbors argue that the Project is adverse because its sheer size does not "fit" the aesthetic context of their neighborhood, and they argue that the Project is undue because it violates all three prongs of the "undue-ness" test.

a. *Adverse*

We must first decide whether the Project is adverse—that is, whether it "fits" its environment. If it does, the inquiry ends, and we do not even reach the "undue" factors.

Applicant has designed the Margaret Pratt facility to be as small as possible while still being economically feasible. They have also used different building facades, changes in exterior colors, and a broken roofline to create the impression of individual units. Nonetheless, the fact remains that the project is roughly thirty times the square footage of the surrounding houses in the Plateau Acres development. Though there are other commercial developments near Plateau Acres as the crow flies, these developments are not easily visible from the subdivision,

---

[9] Neighbors' Question 1 asks, "Does the Quechee Test state that an affirmative answer to any one of the three inquiries under the second prong of the Quechee test means that the project would have an UNDUE adverse effect?" (Emphasis in original). Neighbors' Question 2 asks, "Does the second inquiry under prong two of the Quechee test ask 'Does the project offend the sensibilities of the average person?'" These are both correct statements of the law, and we answer both questions in the affirmative.

and the most relevant aesthetic point of comparison for the Project are the single-family homes in the Plateau Acres subdivision development. The facility would therefore be the only perceptible development of its size in the immediate area. This does not "fit" the residential character of the immediate neighborhood; we therefore conclude that the Project is "adverse" under the first prong of the <u>Quechee</u> test.

### b. *Undue*

Neighbors argue that the sheer size of the building and the aesthetic impact of the building on Dwight Young's land are shocking and offensive to the average person. They also argue that the mitigating measures Applicant has adopted do not address their primary concern: the sheer size of the building. Finally, they argue that the Project violates the aesthetic standard laid out in Section 5-26 of the Bylaws.

### 1. Shocking or Offensive

In Question 3 of their Statement of Questions and at trial, Neighbors raised a threshold issue in the "shocking or offensive" analysis: who is the "average person" to which this test refers? Neighbors each testified that they consider themselves average people, and that they each found the size of the facility to be shocking and offensive. The implication of this argument is that, if they find the Project shocking or offensive, it must be denied under Criterion 8.

The "average person" in the second "undue" prong is something of a legal fiction. Developments often happen near ordinary people who lead ordinary lives. While these people may be "average" in the usual sense of the word, they are not "average" in the legal sense of the word, as used in the <u>Quechee</u> test. The average person under the second "undue" prong is an ordinary person who has no particular stake in the development. Cf. <u>In re Goddard College CU</u>, Docket Nos. 175-12-11 ¶ 173-12-12 Vtec, slip op. at 14 (Vt. Super. Ct. Envtl. Div. Jan. 6, 2014). Unlike most people, Neighbors have a very direct stake in the development, which means that they are not "average" under Criterion 8. In other words, this prong is asking whether the Project is shocking or offensive under an objective standard, not under the subjective perceptions of those closely impacted by the development. Just as we cannot or should not rely solely upon the Applicant's assertion that the proposed project is not "shocking

or offensive," we do not rely upon Neighbors' assertion that it is; we look beyond the parties to seek out an objective person's assessment in our legal analysis. With this standard in mind, we answer Neighbors' Question 3 in the negative.

Applying an objective standard, we conclude that the Project is not shocking or offensive. The Project, though large, is aesthetically appealing. By using varied facades, exterior colors, and rooflines, the Project is visually interesting, and gives the general appearance of a residential structure. The proposed landscaping is attractive, and will help soften and shield the views of the structure. Though the structure is large, it has, at the Neighbors' request, been sited to preserve as much of the view from the plateau as possible. While the building is large, we do not consider it to be "shocking or offensive" because of its size alone, and other design elements make the Project aesthetically appealing. We conclude that the Project satisfies this first undue-ness prong.

### 2. Mitigating Measures

We find that Applicant has taken reasonably available measures to mitigate the effects of the Project on Neighbors. They have designed a lighting plan that is dimmer than lighting plans for comparable facilities; they have designed the exterior of the building to break up the visual effect of the building's size; and they have sited the building to preserve Neighbors' views as much as possible.

Neighbors argue that none of these mitigating measures address their primary concern: the size of the building. They argue that Applicant should be required to reduce the size of the building or break it into smaller units. But while Criterion 8 requires applicants to take "reasonably available mitigating measures," it does not require applicants to fundamentally alter the character of design of their projects. Changing the size of the building or breaking up the building would change the Project from a large, connected building with shared common areas and central facilities to a group of clustered residences. This would be a fundamental change, not a mitigation measure. We therefore conclude that the Project satisfies this second undue-ness prong.

### 3. Clear, Written Community Standard

Finally, we turn to whether the Project violates a clear, written community standard. The written standard Neighbors point to is the requirement in Section 5-26 of the Bylaws that nursing care facilities "respect that traditional scale, proportions, shapes, and rhythms of the immediate neighborhood." We found in the conditional use analysis that the Project complies with this provision, and we therefore conclude that the Project does not violate this standard.

Although we conclude that the Project is adverse to its surroundings, it is not undue, and it therefore satisfies Act 250 Criterion 8. Because this is the only criterion challenged in this appeal, we **APPROVE** Applicant's Act 250 application, subject to any provisions in the District Commission approval not implicated in this appeal.

### Conclusion

We conclude that, subject to certain conditions, the Project will conform to the general and special standards for conditional uses under the Bradford Bylaws. We therefore **APPROVE** Applicant's conditional use application in Docket No. 112-8-14 Vtec, subject to the following conditions:

1. Applicant currently proposes to dim the fourteen pole-mounted lights and 12-foot wall-mounted light to 33% at dusk (with motion activation to 100%) and to turn these lights off (with motion activation to 100%) after 11:15 p.m. Applicant shall instead dim these lights to 33% (with motion activation to 100%) at dusk and turn them off (with motion activation to 100%) at 9:00 p.m.

2. Applicant shall limit vendor deliveries, garbage pickups, and Stagecoach visits to the facility to between the hours of 9:00 a.m. and 4:00 p.m.

3. Applicant shall limit delivery of oversized loads to the Project site during construction to between the hours of 9:00 a.m. and 4:00 p.m.

The Court also **STRIKES** the condition in Applicant's conditional use approval from the Town of Bradford ZBA requiring Applicant to re-open the former Plateau Acres Road.

The appeal of the original site plan approval in Docket No. 111-8-14 Vtec is **MOOT.** We **DISMISS** Questions 2 through 7 in Neighbors' revised site plan appeal, and we **APPROVE** Applicant's revised site plan application in Docket No. 13-2-15 Vtec because we find that the Project is adequately designed to minimize glare. Finally, we conclude that the Project will not have an undue adverse aesthetic impact on the surrounding area under Criterion 8, and we

**APPROVE** Applicant's Act 250 application in Docket No. 100-8-15 Vtec.  These approvals are subject to any conditions or findings in the approvals issued below that were not challenged in this appeal and that are not affected by this decision.

A Judgment Order accompanies this Merits Decision.  This concludes the proceedings currently before this Court.

Electronically signed on June 21, 2016 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division